David Richardson, Mr. Johnson. May it please the Court, I'm Rick Johnson, Tallahassee, Florida. I'm here for Professor Richard Burt, and this is a First Amendment case and it's also a procedural due process case. The case is about issues that are having a great deal more currency in today's news than they were having at the time that these events occurred. Let me tell you, Mr. Johnson, before you get into that, the jurisdictional issue that we have here that concerns me, which is that our decision of Sherman v. Burt Russell Bay TV, which I will admit to you, I think is probably wrong, but nevertheless is binding precedent on us, and it appears to me that because this notice of appeal was filed more than 30 days after July 3rd, that is the deadline for filing an amended complaint, that we lack jurisdiction to review it. Yeah, the Supreme Court has said that if the deadline at issue is not statutory, if it's a judgment deadline, it's a nullity. I filed within the limitations period that was directed by the Supreme Court. The statutory deadline is related to when you have a final order under 1291, a statute. So this isn't about statute versus claims processing rule, as I understand it. The problem is, it appears that under our precedents, which I will tell you, I have doubt about our precedent, but nevertheless, it binds me. It appears that the notice of appeal is untimely. Yeah, and again, whatever your precedent is, the Supreme Court precedent trumps it, and the Supreme Court precedent... The Supreme Court precedent trumps Sherman. Yeah, I didn't even become prepared to argue the jurisdiction, but I cited it, and briefed it extensively in my response. Okay. One more question on that that you may be prepared to answer. Do any of our cases applying Sherman apply in cases where the district court seems to have set the response deadline specifically in the order, as opposed to just relying on it as it comes? Well, that's another thing. No, this would be the first time that it applies there. And what the justices said in the Supreme Court case that I made such a big deal of, and now don't recall the name of... Was it the Jones decision? Yeah, that was it. What they were saying... It predates Sherman. I mean, I agree with you. Sherman seems inconsistent with Jones, but... What they were saying there was that all this person did was obey the district court's deadline, and we're not going to be penalizing somebody for filing a proceeding, a filing within the deadline that was set by the district court. We're not going to be punishing people for obeying court orders. It's just that simple, because if we're going to do that, we're going to be violating due process. And we're also going to be violating the doctrine that it's not a congressional deadline. It's a judicial deadline. And you can't... You can penalize a failure to meet a judicial deadline, but you can't penalize it with a death penalty. So, I mean, that's pretty much what I've got to say about it, is that I've got the Supreme Court on my side, and whatever circuit court opinion contradicts that must submit. It must take the lesser status. You were going to tell us some things about the merits. Pardon me? You were going to mention the merits. I thought you would rather discuss the merits. Yeah, is it okay for me to argue the merits? Sure. Well, the First Amendment and the procedural due process issues were not as hot when this case came up as they are today, but they're more defined now. Campuses in particular are experiencing two kinds of censorship. There's the woke variety, which is mostly coming from left-wing authorities. And then there's the MAGA authority that is mostly coming from right-wing authorities. This court, in a case that I believe has now been withdrawn as moot, the Warren versus DeSantis, that opinion made good points about this. Let me ask you a more basic question. Do you think that Garcetti can apply in any way ever on a college campus? Yes. It could apply to the cafeteria workers. It could apply as you applied it. Not you, but your court applied it to the counselors. It could apply to... When was the professor ever? No, never. Well, because there was a body of prior law by the U.S. Supreme Court consisting of 10, 12 cases that established academic freedom, and Garcetti did not purport to touch them in any way, simply to reserve for another day what they're going to say, if anything, about those cases. These are administrative kinds of communications that are not about classroom instruction at all. Yeah, well, classroom instruction... This is not for scholarship. I mean, this is just about whether you're holding classes remotely or not. Your university policies about how classes are going to meet, isn't that right? Well, there was certainly that element of it, and that's what the district court made such a big deal about. The district court used words like gratuitous and editorializing no fewer than six or eight times in order to belittle the First Amendment content of the speech. The speech was as much about COVID and about how many people are going to live and die as a result of COVID. A million people. And a person at a private business that was going back to work in the office sent an internal email screed against their company's back-to-work policy. Could that company take action against them? Sure they could. Well, the difference is that there's a body of jurisprudence regarding universities, and a university is a unique form of public employment where part of the very purpose of the university is to promote contention and disagreement, including about how the places run. And there is the notion that the faculty in particular not only have the freedom to teach, but the freedom to have a voice. Which was about a university employee complaining about their supervisor, and this court determined that Garcetti applied and there was no First Amendment right in that context for the university employee to complain about this internal matter. Yeah, and that case came before the Supreme Court expanded its conception of Garcetti in two cases. Lane v. Frank was one. Kennedy v. Pemberton was the other. And you could not have handed down that decision today after those modifications of Garcetti came down. Kennedy v. Lane was 2014 and Alves was 2015. Yeah, and then Kennedy came still after that building on Lane. And I think that there was a panel of this court that just didn't want to let go of what had been overturned in Lane. But I think there was an article that you relied on a lot by Professor Whittington, I think, suggested that a fair amount of the language in Kennedy reflected some of the overtones of Establishment Clause precedent. Do you disagree with that? No, I don't disagree with it, but I think that there was some explicit parts of it that I'm more interested in that say that if you're going to say that a thing is part of a professor's job, then you need to be very strict in defining what part of the job is. And there must be a duty. It's something that the professor is required to do, not just something that is generally in the ballpark of the work. So, Professor Burt had no duty. Okay, Yvonne, you've been on our time. You've got five minutes that you're reserved. Let's hear from opposing counsel. May it please the Court. My name is Samantha Giudice-Burdessy, and I'm here on behalf of the President of the University of Florida and the individual appellees as well. To address the Court's first argument, you know, based on the well-established precedent of the Court that has been, you know, reiterated multiple times, even as recently as 2020 and 2023, there is no jurisdiction. The appeal was late. It is very clear that the judgment became final at the point that the appellant chose not to appeal. And everything that happened after, the Court was either considered administrative, or the Court didn't have the ability to do. And that was laid out this exact situation. The fact that here, the district judge, instead of saying that you have X number of days to amend your complaint, and then, of course, our case law says the expiration of that period, then it's final. Here, the district judge specifically said that I'm going to enter a final judgment. The actual language, I think, in the Court's order was for the clerk to enter the final judgment at the point. Coming afterward to enter the final judgment. Exactly. And the clerk didn't do it at the time that it expired. And then the judge ministerially had to say, you know what, clerk, you haven't done this. I direct you to enter it. That was all, it was administrative. And so, and there's not a case, you know, candidly, there's not a case in this situation. But there are multiple cases where the Courts took extravagant action. I think it was Fernandez where a lot of things happened. There were various, like, additions of time. And there was another complaint filed. And it all happened after a day or two had expired on the initial ability to appeal. And the Court said none of that mattered. It all went back to that first expiration of the ability to amend. I'm sorry, to amend. The Court didn't, I think it's interesting, the Court did not affirmatively extend the time. The Court just said that I'm going to direct the clerk to issue a judgment. So this isn't, it's not an instance in which the Court was silent, in which, which is what happened in Sherman. So the Courts come up with a rule that's saying, well, this judgment, it's final is of that date. Here, the Court just said ministerially, there will be a final judgment entered. And I'm directing the clerk to do that. So in that instance, should the plaintiff in this case be penalized when the Court said this is what's going to happen? But also saying there will be a judgment. I don't know that the equity piece or the prejudice can be taken into consideration. It's a jurisdictional issue. And the Supreme Court has said when it's a jurisdictional issue, equity can't be considered. The prejudice can't be considered. So I don't know that the ability to consider that. Your question is whether our precedent in Sherman, and the odd thing about Sherman, of course, is the rule that the Court, that our Court announced, it didn't even apply in that case. Truly one of the strangest precedents I've ever read. I concur, Your Honor. It's like a rule to the teacher. And by the opinion that our Court has nevertheless followed and treated as precedent. But is there really one where we have treated Sherman as precedent that involves this situation? There is not. So we could distinguish Sherman. It is possible. That is particularly in light of, I think the Court was trying to be very cognizant of, I believe it was Rule 58, and that piece of the rule. And there is no precedent in this situation where the facts are similar. Could the Court have said, I extend a deadline 30 days beyond when it would ordinarily be required under Sherman because I disagree with that decision? If they had, I think if the Court had potentially, well, extend the deadline to appeal or extend the deadline to amend? Deadline to appeal. I don't believe so, no. I don't think that the Court could unilaterally extend that deadline to appeal because there are limited instances in which that deadline can be extended, which is outlined in, I think, Rule 4 of the appellate rules. And so I don't think the District Court would have the ability to do that. And imputing maybe intent on the District Court here, the clerk, the order says if the amendment doesn't come in, clerk enter judgment. I think the District Court kind of intended those things to happen at the same time. It didn't come in. Judgment would be entered. We wouldn't be here if that had. The clerk, that didn't happen, which is what has created the issue. Thank you. Moving on to the freedom of speech issue, there is no First Amendment protections for Dr. Burt's communications here to the students. There is an implied exception to Garcetti in the majority opinion, but that applied exception is very, very narrow. The dissent talked about concerns about academic freedom, but when the majority addressed it, the majority addressed it in the context of teaching and scholarship. And all of the other circuits that have adopted that implied exception do so in the context of teaching and scholarship. And almost every opinion looks at whether the professor is engaged in classroom teaching or academic scholarship. I think even one opinion expands it a little, talking about academic rating. Would it have been different, in your view, if the email said, I object to this in person class because students will be, students and I will both be distracted during our lecture by our fears about catching COVID. And many people will be wearing masks, which will cover their faces and make it harder for us to all have the interactive experience that I think leads to so much learning in class. Would that be different? I think it moves the needle, but that's not what happened here. What happened here was Dr. Burt was effectively, it's Morgan. There was an established policy of the university. When it applied to him and he found out it applied to him, he was unhappy with it. He took the opportunity to express that to students, unrelated to teaching, unrelated to any type of academic conversation, unrelated to any type of scholarship, whether it be within his scholarship as an English professor or scholarship generally. And Dr. Burt's attempting to expand that scope here to apply to him, and it just doesn't. It's all of the cases in other circuits that do apply this exception to speech of a public university professor, have found that speech to be squarely within scholarship or teaching, the in-class teaching. And that is just not the case here. I also, with regard to the official duties, I think council touched on that. I'd point out that in the complaints, it is pled that professors were required to, there was a discussion about the remote option, and they were required to put in their syllabus and on Canvas while they were offering the remote option. And that indicates communications to students about where the class was going to be held, the format of the class was well within the scope of the professor's duties to do. And that's what Dr. Burt was doing here. He was administering university policy of in-person courses within the scope and the furtherance of his duties of letting students know where to show up and when to show up and how the class is going to be held, which is all of the administrative piece. It's not related to his scholarship and teaching. To the extent there's any questions, I'm happy to answer them. Your honors, the sister courts that have done Garcetti type cases on campus have followed the Supreme Court precedents pre-Garcetti. That's what they've done. And for example, in the Adams case, counsel says that those cases have said that the limiting language of Garcetti about academic freedom only pertains to in-classroom instruction and scholarship. Yeah, that's what I wanted to get at. Because, yeah, I mean, how can somebody say that? In the Adams case, the issue was the man's extracurricular publications, not those that were toward tenure. In the Deamer's case, the man's- They were never publications. Well, yeah, they were public- They didn't administrate emails to students, were they? Well, where are you drawing a distinction between a non-academic publication and an email? Yeah, I mean, you're getting on a slippery slope there. But in the Deamer's case, what the man was doing was writing a critique of his bosses and how they organized the communications department. And the Ninth Circuit said that's First Amendment protected because, guess what? Garcetti doesn't apply on campus. And in the Merriweather case, what the man was doing was refusing to say a he for a she. And, yeah, that was something extraneous but adjacent to classroom management, the same as Dr. Burt's issue about is it going to be remote or is it going to be in person? In the Buchanan case in the Fifth Circuit, they just decided that we're not even going to look at Garcetti because the court below said Garcetti doesn't apply and we're going to affirm that. In fact, I've only found one case, and that was the one that I cited that was pending before the Supreme Court certiorari was denied, where they applied Garcetti in the way that the court below did. So that is the one and only circuit-level case that has said that Garcetti says that the only speech that's protected is what's uttered in the classroom or what's published in the tenure journals. So... I have a question that may seem afield, but hear me out. Does your client ordinarily use the email signature, Hair Doctor, Reverend, Professor, Blind, Burt, PH4K, Ulta HD, Department of Loser Studies, Pharmacology, and Cosmic Criticism? Well, he'd done it before. I don't know that he does it every time, but he's quit doing it now, but he had done it a number of times prior. Okay. So was he penalized in any way for that before? Yes. Yeah, not exactly penalized, but, you know, chastised. Reprimanded. Yeah, reprimanded.  Does that suggest that what the university was targeting was not his speech or his views about COVID, but the appropriateness of his interactions with students? Well, that's not what they wrote in the document penalizing him. You know, I think there may have been a passing mention of that, but the big thing was that he was disturbing the piece of the campus by putting out things that were inflammatory and causing stress. What way of the university viewed it was insubordinate and disrespectful? Well, insubordinate and disrespectful. What they were saying was that he had a viewpoint that was different from the governor's viewpoint. If he had put out that same email, except that he had said, I have read Governor DeSantis' view, and now I'm going to adopt it. Not only am I going to adopt it, but I'm going to condemn those who disagree with the governor. Nobody would have said that was intemperate. Nobody would have said that was insubordinate. Nobody would have said there was anything wrong with it. It's just a pure and simple viewpoint discrimination case, you know, open, shut, black and white. And I see my time's up, but if you want to give me any more, I'll take it. I don't think so, Mr. Johnson, but we appreciate the offer. We're going to move to our last case.